## GEORGIA POWER CO. v. FEDERAL POWER COMMISSION.

No. 11104.

Circuit Court of Appeals, Fifth Circuit.

Jan. 7, 1946.

Rehearing Denied Feb. 2, 1946.

Dan MacDougald and P. S. Arkwright, Jr., both of Atlanta, Ga., and Wallace Miller, of Macon, Ga., for petitioner.

Louis W. McKernan and Howard E. Wahrenbrock, Asst. Gen. Counsel, Federal Power Commission, of Washington, D. C. (Willard W. Gatchell, of counsel), for respondent.

Eugene Cook, Atty. Gen. of Georgia, for amicus curiae.

Before HOLMES, McCORD, and LEE, Circuit Judges.

LEE, Circuit Judge.

The Georgia Power Company, proposing to construct a hydro-electric power plant at a dam to be built by it on the Oconee River in Georgia, filed a declaration of intention with the Federal Power Commission as required by the Federal Power Act, 16 U.S.C.A. 817. Acting thereon, the Commission held public hearings in Washington and Atlanta to determine whether the interests of interstate and foreign commerce would be affected by the proposed project, and, if so, what navigable waters of the United States would be affected. Following these hearings the Commission found the ultimate facts to be (1) that the Oconee River from Milledgeville, Georgia (four miles below the site of the proposed project), to its mouth, and the Altamaha River into which it flows, are navigable; (2) that the two connect with the Intracoastal Canal and the Atlantic Ocean to form navigable waters of the United States, used and capable of use in the transportation of persons and property in interstate and foreign commerce; and (3) that due to the relation between the storage capacity of the proposed reservoir and the available stream flow the operation of the power plant would both fluctuate and reduce the navigable depths of the water below the dam and would thus affect navigation. From this the Commission concluded that interstate commerce would be affected by the construction of the proposed project, and ordered that the power company apply for and accept a license in accordance with the terms of the Federal Power Act and the rules and regulations of the Commission thereunder.

The power company, here seeking a reversal of this order, contends that the primary facts do not support the finding that the Oconee River is a navigable water of the United States or the finding that the interests of interstate commerce would be affected by the construction of the proposed project. It is also insisted that the provisions of the Federal Power Act, 16 U.S.C.A. § 791a et seq., do not apply to a project that is located on a nonnavigable part of a stream, or, if the Act was intended to regulate such matters, it is to that extent unconstitutional.

The pertinent primary facts found by the Commission are substantially as follows:

The Oconee River rises in Northeast Georgia, in the vicinity of Gainesville, and flows in a general southeasterly direction to Milledgeville below the proposed dam site, where it drops to the coastal plain. One hundred and forty-five miles below Milledgeville it joins the Ocmulgee River at what is known as the Forks, and thus forms the Altamaha River, which flows 137 miles in a southeasterly direction, emptying into the Atlantic Ocean. The Oconee River drains an area of 5,318 square miles, of which 2,900 square miles lie above Milledgeville. From Milledgeville to the Forks, the average slope is slightly more than one foot per mile and there are no falls or rapids. While the Altamaha River has been used the more extensively, both the Altamaha and the Oconee Rivers have been used for navigation over a long period of years by light draft or other river craft. Navigation below Milledgeville has been the subject of congressional and state action, and funds have been spent in the improvement of navigation. A navigation datum plane corresponding to the low water flow during a ten-year period was established by the Army Engineers following a careful resurvey of the river, and the river depth over an average channel width of 60 feet was referenced to this datum plane. Soundings were taken disclosing that in the 145-mile stretch from Milledgeville to the Forks there were only 6.7 miles which had a depth of less than 3 feet below the low-water reference plane, 5 miles thereof being in the 39-mile stretch between Milledgeville and the Central of Georgia Railroad Bridge.

While petitioner attempted to disparage the use made of the river for navigation between Milledgeville and Dublin (located about half way between Milledgeville and the mouth of the Oconee River), the most that the evidence revealed was that a greater use was made of the Oconee below Dublin than above. The Commission found nothing in the record that would justify the conclusion that the River was navigable below Dublin and non-navigable above that point; to the contrary, it found that the physical and hydraulic characteristics of the two sections were not essentially different. With respect to the past history of the river, the Commission said:

"In the year 1803, some 37 years before the first railroad was completed in Georgia, and when transportation by wagon and stagecoach over the poor roads of that pe-

riod was slow and difficult, the State Legislature located the town of Milledgeville 'at or near the head of navigation on the Oconee River.'

"In December 1804, the Legislature agreed to and approved of the town site, as theretofore fixed upon and laid off pursuant to the Act of May 11, 1803, and declared the town of Milledgeville 'to be the permanent seat of Government of this State.' Milledgeville was the capital of Georgia for 63 years, from 1804 to 1867. That the advantage of water transportation was one of the controlling considerations in the location of the State capital on the Oconee River can hardly be gainsaid.

"The State of Georgia spent some $45,000 for navigation improvements above Dublin, and private navigation companies also participated in the improvement of the river. By the time Congress commenced appropriating money for improvement of the river (June 18, 1878), railroads had been constructed and channels of commerce were fairly well established in the region.

"The influence of shipping points and established transportation routes upon development of the Oconee River as a navigation route is evidenced by the emphasis placed upon improvement of the section of the river between Dublin and the Central of Georgia Railroad Bridge, some 29 miles upstream. However, for more than 50 years Congress has consistently treated the entire river below Milledgeville as navigable and as susceptible of increased navigation use. Furthermore, the many reports submitted to Congress by the Corps of Engineers, U. S. Army, present the views of these navigation experts to the effect that the river is suitable for navigation use up to Milledgeville, and such reports contain impressive records of the volume of commerce which has been handled not only on the Oconee River but also on the Altamaha. In addition to use by steamboats and other craft, the record shows that the river has been used for rafting.

"Declarant regards the present lack of commerce and alleged lack of prospects for profitable commerce on the Oconee River as indicative of conditions preventing navigation, but neither lack of commercial traffic nor unprofitable traffic operations is controlling as to navigability. On the basis of the long record of actual use, the assertion of jurisdiction by Congress during the past 66 years, and more particularly during the past 54 years, and the testimony as to suitability of the river for navigation, we hold that the Oconee River is navigable from Milledgeville to its mouth, and that the Oconee and Altamaha Rivers form a navigable water of the United States from Milledgeville to the sea, over which persons and property can be and have been carried in interstate commerce."

The project which petitioner proposed to construct will consist of a dam about 100 feet high across the Oconee River, 4.3 miles upstream from Milledgeville; a hydro-electric power plant at the dam, with two generating units of equal capacity to operate under a maximum power head of 92 feet; and a reservoir with a gross capacity of 294,000 acre-feet and a usable capacity of about 208,000 acre-feet, which when full would extend upstream some 25 miles and flood 15,000 acres of land. To operate its plant petitioner proposed to install two hydro-electric turbines, each with a discharge capacity of 3,600 cubic feet per second, the turbines to operate singly or simultaneously, according to power demand and available storage, and the rate of the inflow into the reservoir. The average flow of the river at Milledgeville is approximately 3,600 c. f. s., and the flow exceeds 1,400 c. f. s. more than three quarters of the time. Boats of light draft, according to the evidence, can operate below Milledgeville when the flow is less than 1,400 c. f. s., but the flow most useful to that type of navigation and best adapted to the river ranges upward from 1,400 c. f. s. to an average flow at Milledgeville of 3,600 c. f. s.

In its declaration of intention petitioner set forth that it intended to operate its power plant as a storage hydro-electric development, and the Commission found that the power load to be carried by the plant, and consequently the discharge from the turbines, would vary through a very wide range. It also found that during the periods of low and moderate flow, such as generally occurred during the summer and autumn of each year, the flow in the river immediately below the dam would be reduced to 250 c. f. s. for eight hours each week-day from Monday to Friday, inclusive, and to an average of 500 c. f. s. during the 56-hour week-end period; that on week-days the flow immediately below the dam would range from a minimum of 250 c. f. s. to a maximum possibly as high as 7,200 c. f. s.; and as a result major variations would occur in the stage and navi-

gable depths available for any kind of useful navigation below Milledgeville; that the draft of boats operating on the river ranged from 16 inches to 3.5 feet; and that the intermittent discharge and the restrictions in discharge would adversely affect the navigable capacity of the river from Milledgeville to Dublin, at times would render impossible any navigation around Milledgeville, and during certain seasons would seriously interfere with navigation at, above, and below Dublin.

■ A careful reading of the record discloses that the Commission's findings are supported by substantial evidence; in such circumstance we may not disturb them.

Petitioner, however, urges that while there has been some navigation by light draft boats at times in the past on the Oconee River as far as Milledgeville, the evidence as a whole leads inevitably to the conclusion that the Oconee River above Dublin in its natural state is nonnavigable, and that this has been its history down through the years. Petitioner urges that the test to be applied with respect to navigability is that laid down by the Supreme Court in The Daniel Ball, 10 Wall. 557, 563, 77 U.S. 557, 19 L.Ed. 999, in which it was stated: "* * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

The test laid down in The Daniel Ball was generally adhered to by the Supreme Court until the decision in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, in which the court gave the term "navigable waters" in the Federal Power Act a broader construction than that laid down in The Daniel Ball and in decisions that followed it. In the Appalachian Electric Power Co. case, the court had under consideration the Federal Power Act which defines navigable waters in these words: "* * * 'navigable waters' means those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids, together with such other parts of streams as shall have been authorized by Congress for improvement by the United States or shall have been recommended to Congress for such improvement after investigation under its authority." Section 3(8), 16 U.S.C. § 796(8), 16 U.S.C.A. § 796(8).

■ And referring to the test laid down in The Daniel Ball, the court said [311 U.S. 377, 61 S.Ct. 299]:

"In the lower courts and here, the Government urges that the phrase 'susceptible of being used, in their ordinary condition,' in the Daniel Ball definition, should not be construed as eliminating the possibility of determining navigability in the light of the effect of reasonable improvements. The district court thought the argument inapplicable.

"The circuit court of appeals said: 'If this stretch of the river was not navigable in fact in its unimproved condition, it is not to be considered navigable merely because it might have been made navigable by improvements which were not in fact made. Of course if the improvements had been made the question of fact might have been different.'

"To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. 'Natural' and ordinary conditions' refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken. Congress has recognized this in section 3 [16 U.S.C.A. § 796(8)] of the Water Power Act by defining 'navigable waters' as those 'which either in their natural or im-

proved condition' are used or suitable for use. * * * The power of Congress over commerce is not to be hampered because of the necessity for reasonable improvements to make an interstate waterway available for traffic.

"* * * The plenary federal power over commerce must be able to develop with the needs of that commerce which is the reason for its existence. It cannot properly be said that the federal power over navigation is enlarged by the improvements to the waterways. It is merely that improvements make applicable to certain waterways the existing power over commerce. In determining the navigable character of the New River it is proper to consider the feasibility of interstate use after reasonable improvements which might be made.

"Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. Small traffic compared to the available commerce of the region is sufficient. Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense. * * *"

A comparison of the evidence concerning the navigability of New River, before the court in the Appalachian Electric Power Co. case and the evidence before us here is most revealing. The Oconee has a greater volume of water; its fall per mile is less; it is virtually free of shoals; and the navigation over it in the past has been more frequent and in far greater volume. If, therefore, New River was feasible for interstate use after reasonable improvements which might be made, the evidence before us fully establishes that the Oconee must also be feasible for such navigation. The evidence also establishes that the intermittent releases of water in operating the proposed hydro-electric power plant will at intervals retard the flow below the dam site, thus causing a fall in the water levels to such a degree as to affect adversely navigability in the Oconee River at and below Milledgeville, as far south as Dublin.

The contention that the jurisdiction of the Commission under the Federal Power Act is limited to the navigable waters of a stream ignores that portion of Section 23 (b) of the Act providing that "Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this Act. * * *"

■ We fully agree with the Fourth Circuit that: "One of the purposes of the Water Power Act was to authorize the Commission to license dams in navigable waters of the United States in lieu of an Act of Congress; and in our opinion one of the purposes of section 23 * * * was to likewise take care of the case of a proposed structure in a non-navigable tributary of an interstate navigable stream." United States v. Appalachian Electric Power Co., 4 Cir., 107 F.2d 769, 795.

■■ That Congress has the power to legislate where commerce between the states or with foreign countries may be affected is no longer an open question. And such power is not restricted to "an adverse effect upon the present and existing navigable capacity of federal waters"; it extends to navigable capacity after reasonable improvements which might be made, and whether the effect is beneficial or injurious. The Federal Power Act was intended to develop, conserve, and utilize the navigation and water power resources of the country, and to that end requires that projects licensed shall "be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce," hence, "if upon investigation [the Commission] shall find that the interests of interstate or foreign commerce would be affected," it may require a license. 16 U.S. C.A. §§ 803(a), 817.

■ We agree with the Commission that the Altamaha River and the Oconee River below Milledgeville are navigable waters of the United States within the meaning of the Federal Power Act, and that the operations of the proposed project would affect adversely navigation thereon.

■ The question with respect to the applicability and constitutionality of the Federal Power Act with respect to petitioner's project located above navigation on the Oconee River, we think has been disposed of in the affirmative by the Supreme Court in United States v. Appalachian Power Co., supra, and in Oklahoma v. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; Fox River Co. v. Railroad Commission, 274 U.S. 651, 47 S. Ct. 669, 71 L.Ed. 1279.

The order of the Commission is affirmed.