UNITED STATES of America,
Plaintiff-Appellee,

v.

JOSEPH G. MORETTI, INC.,
and
Joseph G. Moretti, Jr., Defendants-Appellants.

No. 71-3137.

United States Court of Appeals,
Fifth Circuit.

May 15, 1973.

John Robert Terry, Joseph A. Mc-Gowan, Miami, Fla., for defendants-appellants.

Robert W. Rust, U. S. Atty., Kenneth G. Oertel, George A. Kokus, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before John R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Proving again that legislative intent frequently comes to exceed even the wildest imagination of those responsible for enactment, it is ironic that as a product of a laissez-faire society, a 19th Century act is now once again the effective tool in this decade's awakening awareness of the importance of man's environment. The Rivers and Harbors Act of 1899[1]—itself the product of congressional dissatisfaction with the consequences of the Supreme Court's Willamette Iron Bridge Co. v. Hatch, 1888, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629, holding that there was no federal common law prohibiting an obstruction to a navigable stream—was at once the source of jurisdiction and the substantive basis for the action of the District Court.

[1]. Rivers and Harbors Act of 1890, 26 Stat. 426, shortly replaced by the Act of 1899, 30 Stat. 1121, now found 33 U.S.C.A. §§ 401–426i. See Environmental Law: The Rivers and Harbors Act of 1899—a new remedy for illegal dredge and fill operations, 24 Fla.L.Rev. 795, 796 n. 11 (1972).

Applying § 10 of the Act[2] which forbids the creation of obstructions in, or alteration of the features of the navigable waters of the United States without permission of the Secretary of the Army the Court ordered Joseph G. Moretti, Jr. to undo dredge and fill operations involving 400,000 cubic yards of earth, because of his failure to obtain the required permit, 331 F.Supp. 151. Despite the fact that Moretti violated the Act[3] flagrantly and our settled conviction that mandatory affirmative relief requiring a burdensome performance is statutorily and equitably appropriate on these facts, we modify and remand for completion of administrative action which conceivably could have the effect of validating the work done, thus rendering the issues litigated moot.[4]

Moretti owns lands at Hammer Point on Key Largo, one of the Florida Keys curving fingerlike for 120 miles into the Gulf of Mexico off the southern tip of Florida. His property was located about 1⅛ miles from Tavernier on the Florida Bay side of the Key. Tavernier lies to the south of Hammer Point. Hammer Point is in turn about 4½ miles southwest of Rock Harbor.

Like the developers in our far-reaching opinion of Zabel v. Tabb,[5] he pro-

---

2. Section 10 states:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

The statutory authority for the injunction is found in § 406 which states:

> Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

3. Without a doubt the Judge was moved because of ecological not navigational factors. He found that the adverse ecological consequences of the dredging and filling operation included the destruction of habitats of a large number of wading birds (including roseate spoonbills, reddish egrets and herons), removal of peat from the bottom of the bay deleteriously affecting the ability of the shallow water to support marine life, elimination of mangroves which play an important role in the ecology of the area, and significant injury to sport fishing in the area.

4. Our not reversing the District Court expresses no approval of the cursory procedural aspects of the proceedings below. The haste with which the hearing and rulings were announced might well have been less than acceptable and required a remand, but the appellant expressly waived these objections at oral argument in favor of a ruling on the merits. We would say, however, that the inordinate swiftness probably accounts for the court, presumably on the government's insistence, paying no attention to the administrative structure built into the Act.

5. 5 Cir., 1970, 430 F.2d 199, cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808. See Environmental Law—Consideration Must Be Given to Ecological Matters in Federal Agency Decisions, 71

posed to dredge and fill the land into a network of land fingers and canals for use as a mobile home park. Moretti, unlike his counterpart in *Zabel*, decided to forego the prerequisite imprimatur of the Corps of Engineers before making his proposed project a reality. Having purchased his land in 1969, Moretti had completed substantial work on his project when paid a fateful visit by two employees of the Environmental Protection Agency in December of 1970.

Lee Purkerson and John Hagen, the EPA employees, were not on official business at the time that they noticed the extensive work on the Moretti project. They took some pictures of the drag-line as it was removing soil from the underwater portion of the Bay bottom and adding it to the shoreline thereby moving the shoreline and Moretti's property bayward. They could also see where channels had been cut or deepened between the fingers. Moretti asked them what they were doing there, a question which they turned back at him. They asked him if he had a Corps of Engineering permit and he said he did not. These facts were reported to the Jacksonville office of the Corps of Engineers. On December 30, 1970, the Corps ordered Moretti to cease from further work below the mean high water mark because this was a violation of Federal law unless properly authorized by the Secretary of the Army.

After one or two exchanges with the Corps Moretti stopped working, a cessation which was to last for at least a few months. As authorized under Corps regulations the Moretti Company applied for an after-the-fact permit to dredge part of and fill part of Florida Bay. That is, he sought a permit which would legitimize the work done and to be done.

*Structure of the Act and Regulations*

In addition to construction and maintenance of flood-control and other improvements on the navigable waters of the United States, the Secretary of the Army acting through the Corps of Engineers has been charged by Congress with administering the Rivers and Harbors Act of 1899[6] as well as the other principal laws enacted for the protection of navigation and the integrity of the navigable waters of the United States. The Corps of Engineers—the eyes and ears, and sometimes hand of the Secretary—is headed by the Chief of Engineers who is charged by law[7] with advising the Secretary of the Army of the propriety of issuing permits. The Corps itself is divided into 11 "divisions" which are in turn subdivided into 37 "districts." As will be seen later, authority to grant permits is in some cases delegated down to the level of the District Engineers.

The duties of the Secretary of the Army and the Corps of Engineers under the Act together with the administrative procedures which include the delegation of authority through the Corps are set out at 33 C.F.R. § 209.120 (1972).

The Secretary has authorized the Chief of the Corps, at the latter's option, to delegate authority to issue permits to District Offices of the Corps in any case in which the application for construction

Boston College Ind. & Comm.L.Rev. 674 (1971); Comment, 50 B.U.L.Rev. 616 (1970); *Note*, 19 Kan.L.Rev. 539 (1970) and *Note* 16 Vill.L.Rev. 766, 778 (1971) which describes Zabel as "an important innovation in the struggle to preserve the environment of the coastal zone." *Cf.*, The Refuse Act Permit Program: The Corps of Engineers' Role in Enforcement and Administration, 9 Houston L.Rev. 683 (1972).

6. See footnote 1, *supra*. The sections of the Statute as enacted, e. g., § 10, do not correspond to the Sections of the Statute as codified in 33 U.S.C.A. §§ 401–426i. Section 10 of the original act is § 403 of 33 U.S.C.A. This is pointed out for no other reason than to save the reader the possible confusion which might be encountered.

7. See, e. g., § 403 of 33 U.S.C.A., note 2, *supra*, the Section which defendant Moretti failed to heed. In this section Congress has required that certain permits not be issued unless "recommended by the Chief of Engineers and authorized by the Secretary of the Army."

in navigable waters is "entirely routine and * * * involve[s] no difference of opinion * * * nor any opposition or other considerations which should be decided by higher authority."[8] The regulations specify that this grant is not a delegation of the Secretary's discretionary powers.[9] By § 209.120(c)(1)(iii) the Chief of Engineers has exercised this authority and commissioned Division and District Engineers with power to grant permits in the name of the Secretary where the matter is routine.[10]

The Corps' general policy for issuing the permits require that it take into consideration and evaluate "all relevant factors, including the effect of the proposed work on navigation, fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest * * *."[11] More specifically the Corps is required by its regulations, various statutes, executive orders and an accord between the Secretary of the Interior and the Secretary of the Army[12] to consider all applicable data including the views of other federal agencies and the views and objections of state agencies before granting a permit.

The watchword of the Corps' relation with other federal agencies charged with protection of the environment is cooperation. Besides its duty to cooperate and collaborate the Corps is charged by executive order, as are all federal agencies, to improve water quality through prevention control and abatement[13] of water pollution. In its attempt faithfully to carry out this responsibility the Corps has through formal regulations[14] established a policy, in cases where dredging operations may cause pollution problems, of seeking the technical assistance of state and federal pollution control authorities and conditioning the granting of the permit on the establishment of controls which will insure that federal and state water pollution control standards are met. This policy, and other statutorily required policies are summarized in a "memorandum of understanding" between the Secretary of the Army and the Secretary of the Interior signed July 13, 1967.

---

8. § 209.120(c)(1)(i).

9. § 209.120(c)(1)(ii).

10. § 209.120(c)(1)(iii):
    *Division and District Engineers.* The Chief of Engineers has authorized Division and District Engineers to issue direct from their own offices, in the name of the Secretary of the Army, permits under Sections 10 and 14 of the Act of March 3, 1899, for work and structures in or over navigable waters in cases which are entirely routine and which involve no doubt as to the law, facts or regulations nor any opposition or other consideration which should be decided by higher authority. A case is held to be entirely routine, as determined by the Division Engineer, if the approval of the plans would unquestionably be given were the matter presented to the Chief of Engineers and the Secretary of the Army. The mere fact that proposed work is extensive in scope does not necessarily remove it from the class of routine cases if no possible objection to the work can be foreseen. Applications for permits for works in navigable waters which extend a reasonable distance beyond harbor lines will be considered routine, if they otherwise conform to the foregoing criteria.
    The after-the-fact permit procedures, discussed in text, *infra*, so vitally important to appellant, are treated for purposes of delegation of authority to District Engineers just as any other permit. That is, subject to the special restrictions, *infra*, the District Engineer handles these as he would any other "routine" permit application.

11. Section 209.120(d)(1).

12. As to the regulations see, e. g., § 209.120 (d)(3). "Consideration is given to the effect of proposed coastal structures or improvements upon existing navigation projects and upon adjacent shore properties * * *."
    The statutes, executive order, and agreement, are discussed in text, *infra*.

13. Executive Order 11288 is transplanted and summarized by the Secretary of the Army in § 209.120(d)(8).

14. Id.

The memorandum of understanding was drafted in recognition of the statutory responsibility[15] of the Corps of Engineers and the Department of Interior to interrelate their activities in the area of water pollution control where damage to fish and wildlife is possible as well as in recognition of the agencies responsibilities under Executive Order No. 11288 as discussed above. The memorandum sets forth procedures—given life in the Corps of Engineers permit procedure, *infra*—for carrying out these policies.

These procedures provide that (i) upon receipt of an application for dredging or filing permits the District Engineer shall notify Regional Directors of the Federal Water Pollution Control Administration, Fish and Wildlife Service, National Park Service, and the appropriate state agencies. (ii) The Regional Directors would immediately make such studies and investigations as are necessary and inform the District Engineer whether the quality of the waters will be reduced in violation of applicable standards or the value of natural resources and related environment will be unreasonably impaired. (iii) The District Engineer will hold public hearings when response to a public notice indicates that all parties will not have an opportunity to be heard except at a public hearing. (iv) Besides weighing *all* factors in granting a permit the District Engineer shall, when advised by the Regional Directors that work proposed will impair water quality or related natural resources encourage the hopeful permittee to take steps to resolve the dispute at the district level and failing this shall refer the case to the Chief of Engineers —his counterpart the Regional Director submitting his views to his agencies "Washington headquarters"—for appropriate action. (v) Finally the Chief of Engineers and the Under Secretary of Interior shall consult and attempt to resolve any differences between their departments and failing this the case shall be submitted to the Secretary of the Army for decision after consultation with the Secretary of the Interior.[16]

The Corps regulation §§ 209.120(e), (f) and (g) govern the applications for permits and the handling of these applications with regard to public hearings and notices to other agencies of federal and state governments. The regulations place the duty of giving both public notice and notice to the other agencies mentioned above on the District Engineer. The permit application must contain a sketch showing the location and extent of the work proposed. This sketch will accompany the Engineer's notice. The regulations state flatly that "the public notice is mandatory, and no permit or extention of time in which to complete work authorized by a permit will be granted unless notice has been issued and a reasonable time afforded for a protest * * *."[17] The period in which the permit is to be kept pending awaiting objections is set at a minimum of ten days after issuance of notice. The regulations further provide that under normal circumstances the period should be not less than 30 days after the actual mailing of notice, and a longer period can be afforded in exceptional or im-

---

15. *See,* Fish and Wildlife Coordination Act, 16 U.S.C.A. § 661, et seq., Fish and Wildlife Act of 1956, 16 U.S.C.A. § 742a et seq.

Perhaps the largest raptor to be added to the statutory ecological protection aviary is the National Environmental Policy Act of 1969, §§ 101–207, 42 U.S.C.A. §§ 4331–4347. In Zabel v. Tabb, 5 Cir., 1970, 430 F.2d 199, cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808, we held that the Act's § 101 has talons meant neither to be ineffectively blunt nor always remaining on the wrist, only mock-ingly suggesting fierceness of their ever tethered bearer. Rather, with this tool, the Secretary of the Army is empowered— indeed required—to "consult with, consider and receive" information regarding the nature of work sought to be done and to seek out those permit applications which should not be granted and interdict their flight.

16. The memorandum is set out in its entirety at 33 C.F.R. § 209.120 beginning at page 322 (1972).

17. Section 209.120(f)(1).

portant cases.[18] Public hearings are provided for whenever it appears that there is sufficient public interest to justify such action and in case of doubt a public hearing is required. Cited as a specific example are cases in which there is general public opposition to issuance of a permit.[19] Hearings, when held, are to be conducted in an informal manner, presided over by the District Engineer or his delegate with a full opportunity given each side to express their views. Formal adversary proceedings are not contemplated.[20]

In a sentence, the regulations contemplate application, proclamation, coordination, information, argumentation, consideration and then determination.

Whatever doubts there might be about the Third Circuit's reading a permit structure into the related Refuse Act, 33 U.S.C.A. § 407 (§ 13 of the Rivers and Harbors Act of 1899) in United States v. Pennsylvania Industrial Chemical Corp., 3 Cir., 1972, 461 F.2d 468, cert. granted, 409 U.S. 1074, 93 S.Ct. 689, 34 L.Ed.2d 662, it is positive that § 10 (33 U.S.C.A. § 403) is structured on a permit basis. Indeed the Act itself,[21] by its very terms makes it unlawful "to excavate or fill * * * any navigable water of the United States, unless the work has been [i] recommended by the Chief of Engineers and [ii] authorized by the Secretary of the Army * * *."[22] And the regulations, which are in no wise questioned here, specifically authorize an application for, and the granting of, a permit after the commencement or completion of the work, under appropriate circumstances.

After-the-fact permits—so vitally important to whatever chances Moretti has for saving the Hammer Point project—are specifically recognized in the Corps regulations.[23] Read in conjunction with all the regulations, the regulations concerning after-the-fact permits provide that they be processed in the same manner as other permit applications. These procedures were not followed to full completion of the administrative processing of this application in this case. This is of great import to what we do in this opinion.

So long as that regulation stands the Department of the Army was required to respect it. *Cf.* Vitarelli v. Seaton, 1959, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; and *see* Schatten v. United States, 6 Cir., 1969, 419 F.2d 187; Smith v. Resor, 2 Cir., 1969, 406 F.2d 141; and Elmo Division of Drive-X Company v. Dixon, 1965, 121 U.S.App.

---

18. Section 209.120(f)(5).

19. Section 209.120(g)(1) and (2).

20. Section 209.120(g)(4).

21. See note 2, *supra*.

22. Id.

23. Section 209.120(c)(1)(iv) states:
    *Construction and Other Work Performed Without Prior Authority.*
    (a) District Engineers are authorized to approve plans for structures and work of the classes for which they are authorized to issue permits when the application for approval is submitted after the commencement or completion of the structures or work, subject to the following:
    (1) Approval will be limited to those cases where the necessary primary authority, State or Federal as the case may be, validly exists, when the work was innocently constructed, and when there is no objection to the work,
    (2) The applicant will submit the plans in the prescribed form,
    (3) Notice of the application will be duly issued
    (4) The approval will be issued in the prescribed form, Eng Form No. 96c, W.D., Eng.,
    (5) The approval will be signed and recorded as prescribed for permits,
    (6) Application for approval of plans for work which has been completed requiring actions by higher authority will be reported as prescribed for permit applications, and
    (7) When forwarding approval, the applicant will be informed that the law contemplates prior approval, and that, in the future, plans must be submitted in ample time for their consideration by the Chief of Engineers before construction is started.

D.C. 113, 348 F.2d 342. Moretti had a right to file the application and have it processed in accordance with those regulations. Conversely, the Corps of Engineers as the delegated agent of the Secretary of the Army had the duty to process Moretti's application.

But as it was, somewhere during administrative gestation the permit application was aborted, an event provoked by the mandatory injunction of the District Judge.

### The Buck Stopped Where?

The record reflects without dispute that the resident engineer in the Miami Beach office of the Corps forwarded the after-the-fact permit application to the Jacksonville District Engineer's office without objection.[24] Both he and the responsible employee in the District Engineer's office testified that in practice if the permit were a "routine case" in which no likely objection could be foreseen the District Engineer would grant or deny the permit.[25] If controversy seemed likely or in fact developed regulations prescribed that the decision should be made by "higher authority." [26]

Likewise, in practice, in approving the permit under usual circumstances the Jacksonville District Engineer committed to Mr. Arthur L. McKnight, Chief of the Operations Division, the authority to act for the District Engineer. That is, if the permit application, before the fact or after-the-fact, were approved by Mr. McKnight and the project was within the authority delegated to the District Engineer,[27] Mr. McKnight would direct the final approval of the application and issuance of the permit in the name of the District Engineer.

When Jacksonville received the permit application and found everything in apparent order it issued a public notice and informed the appropriate state and federal agencies[28] as required by the regulations. The Florida authorities, after some indecision, stated that they had no objection to the completion or existence of the project. The Bureau of Sports, Fisheries, and Wildlife of the Department of Interior, however, objected to the granting of the permit and requested that the Corps of Engineers refuse to issue the permit. The Secretary of the Interior—speaking through his regional field representative—has literally adopted the views of the Bureau of Sports, Fisheries, and Wildlife. The Bureau of Sports, Fisheries, and Wildlife objected on the ground that to grant the after-the-fact permit would "provide *official sanction to an illegal operation*." [29]

24. It is not clear whether the Resident Engineer made a recommendation that the permit be granted or simply forwarded the permit without objection. In either case his sending the permit to Jacksonville from Miami was in effect an endorsement of the application since he testified that if he had objections to the application he would normally return it to the parties with requests for alteration.

25. *See*, § 209.120(c)(1)(iii).

26. *Id.* Of course what passing the application to "higher authority" entails is detailed by the applicable statutes and the memorandum of understanding between the two Secretaries, as well as the substantive and procedural requirements of the Corps of Engineers' regulations, *supra*.

27. See note 10, *supra*.

28. See notes 15 and 17, *supra*.

29. It is at least arguable that this is an insufficient ground for "objection" under a permit structure which allows for after-the-fact permission. However, since the letter of objection from the Bureau of Sports, Fisheries and Wildlife stated that Moretti's own actions had made it impossible to tell how much damage had been done they would object on this seeming *clean hands/policy ground*. It is not completely clear whether they were saying (i) Moretti made it impossible to tell how much ecological damage had been done so we will presume that more than a tolerable amount had been done or (ii) Moretti is a bad fellow and should not be given a permit since we would be condoning his actions or (iii) both (i) and (ii).

The Environmental Protection Agency did not object to the issuance of the permit. It suggested—without reference to the permit application—that the case be

At this point the permit granting procedure seems to have ground to a halt and left Moretti's application in a sort of limbo[30] if not in fact stranded by the ubiquitous "sunken object." Although standard procedure under the regulations would have been for the Jacksonville office to forward the application to Washington because of the objections of the other government agencies, nothing was done, that is, nothing was done by the Corps of Engineers on the application.[31]

### Self Help For The Impatient?

Despite the unrevoked order of the District Engineer to discontinue dredging, Moretti resumed working below the mean high tide line, apparently in early June 1971. Presumably, he simply decided that he had waited long enough for the Corps of Engineers to act on his permit and that it was time to resume the construction of Hammer Point.

The permit application had been forwarded from Miami to Jacksonville on March 4, 1971. Notice had been given by the District Engineer's office on March 17 stating that objections were due by April 16. Interior, as well as one state agency, requested a delay in the granting of the permit so that it would have time to respond adequately. Interior's objections, voiced by Bureau of Sports, Fisheries & Wildlife, and echoed by the Regional Director were lodged May 3, and Moretti was informed of the objections. It does not appear that a public hearing was ever scheduled.

Rumors that Moretti had resumed work reached the Jacksonville office which instructed engineer Ross of the Miami office to investigate the situation. On July 14, 1971 he found that Moretti had resumed, and substantially completed, work on the Hammer Point project.

### The Scene Of Action Shifts

Pricked by Moretti's disregard of the permit requirements the government lashed out on several fronts. An information was filed by Engineer Ross charging Moretti with a criminal violation of § 403 [32] which is outlawed by 33 U.S.C.A. § 406 and Moretti was arrested July 15. While Moretti was appearing for arraignment on July 30, originally set before a magistrate but taken over by the trial judge, Moretti was served with the civil complaint seeking preliminary and permanent injunction of further operations below the mean high water mark and for relief in the form of a mandatory injunction forcing Moretti to undo the fruits of his labors, all as authorized by § 406.[33]

After a short hearing the trial court issued a preliminary injunction and proceeded to hear the case on the merits three weeks later. The court found, as is evident from the record, that Moretti had done substantial dredging and filling without a Corps of Engineers per-

---

investigated and that legal action be initiated for any damages to the environment. But with the Executive Branch having importuned its Department of Justice to seek court relief on the ground of ecological damage, it is plain that in any Corps proceedings this would have been a significant if not decisive issue.

30. Perhaps one reason that we are not entirely sure what happened to the permit is that Mr. McKnight, the Chief of the Operations Division of the Jacksonville office, retired on May 31, 1971. No one else from the Jacksonville office testified and no effort was made by the government to show what happened to the application after he left.

31. There was also apparently some problems with the technical adequacy of Moretti's permit application. It was discovered in Jacksonville that the application apparently did not show one of the channels that Moretti had dredged. He acknowleged this deficiency in a letter to the Corps and although it appears to have been one of the problems in granting the permit it was a mere technical imperfection which from all appearances could have been easily corrected. The record does not suggest that it caused the Corps to abandon its standard orderly permit processing procedure.

32. See note 2, *supra.*

33. Id.

mit. The Court found the waters navigable, and determined that some of the work was done in the navigable water. The District Court ordered that the government should have all the relief it sought—namely to have Moretti undo what he had done.

Moretti challenged in the District Court and challenges on appeal the proof of a number of necessary elements of the government's case under 33 U.S.C.A. § 403 and § 406. They are (i) whether the water in question is "navigable water of the United States," (ii) whether the Mean High Water Mark was adequately proven, (iii) whether any obstruction to navigation had been created, and (iv) whether § 406 of the Act authorized the District Court to order the removal of a land fill as a "structure."

### Navigability

Florida Bay is located at the southern tip of the Florida peninsula and merges with the Gulf of Mexico on its western boundary. On the east, Florida Bay is adjacent to Biscayne Bay which leads to the Port of Miami.[34] The length of Florida Bay is traversed by the Intracoastal Waterway which runs from the Gulf and enters Biscayne Bay through Florida Bay. Although the record did not reveal the precise distance of appellant's property from the Intracoastal Waterway, it is clear that it is in close proximity to this Waterway. The Coast and Geodetic Survey Chart shows that at its nearest point, the Intracoastal Waterway is less than one-half mile from Hammer Point.[35]

Navigability, even at a time when its requirements were more stringent, was simply a question of whether the waterway "in its natural and ordinary condition affords a channel for useful commerce." The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999 (1871).[36] Accessible as it is to both the Gulf of Mexico and Biscayne Bay, and traversed lengthwise by the Intracoastal Waterway, Florida Bay is a natural passage for commerce and easily meets even the historical-literal test of navigability. Of course, as with most bodies of water, there comes a point where the depth of water is minimal as the bottom slopes up to the bank. But one would hardly contend that the Mississippi is any less navigable simply because a pirogue would go aground at the water's edge.

Questioned directly as to the navigability of Florida Bay the Resident Engineer for the Corps testified unequivocally that Florida Bay is a navigable water. Indeed, if Florida Bay were unnavigable Moretti's development of his property including finger slips and canals so that his mobile home park would be a "live-in marina" would be incomprehensible and obviously wasteful and a deception to purchasers who expected waterborne access to the sea, not the restricted movement in a short landlocked pond.

### Obstruction To Navigation

Moretti's argument that there was no showing of an obstruction to

---

34. Biscayne Bay has long been judicially recognized as "navigable." See Miami Beach Jockey Club v. Dern, 1936, 65 App.D.C. 369, 83 F.2d 715, cert. denied, 299 U.S. 556, 57 S.Ct. 17, 81 L.Ed. 409.

35. C&GS, 850, August 1972.
   What is for mariners to rely on may safely be used by Judges. See, De Bardeleben Marine Corp. v. United States, 5 Cir., 1971, 451 F.2d 140. The chart shows a depth of 2 feet along the north edge of the key in the Hammer Point area.

36. "The test laid down in the DANIEL BALL was generally adhered to by the Supreme Court until the decision in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, in which the Court gave the term 'navigable water' in the Federal Power Act a broader construction than that laid down in the DANIEL BALL and in the decisions that followed it." Georgia Power Co. v. Federal Power Commission, 5 Cir., 1946, 152 F.2d 908, 912. The expansion of the concept of "navigability" was to include the capacity for reasonable improvements as an indicia of the ability of the waterway to support commerce—whether presently or potentially.

navigation, and hence that one element prerequisite to relief was missing from the government's case, is unavailing. In light of Zabel v. Tabb, 5 Cir., 1970, 430 F.2d 199, 207 and United States v. Perma Paving Co., 2 Cir., 1964, 332 F.2d 754, any argument that the filling of navigable waters does not reduce navigable capacity of the filled waterway and thereby constitute an obstruction within the meaning of § 403 borders on the frivolous.[37]

### Structures

■ Moretti next contends that § 406[38] grants to the District Court only the authority to cause the removal of "structures" from navigable water and that a land fill is not a structure. The meaning of "structures" in this provision has often enough been the subject of litigation[39] that we have no doubt that it encompasses the land fills here in question. As the Supreme Court said in United States v. Republic Steel Corp., 1960, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, its decision in Sanitary District v. United States, 1925, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352, is enough. In Republic Steel the Supreme Court held that accidental sedimentation which caused the filling of a navigable water constituted a structure within the meaning of § 406. This double-bottomed answer is enough for us.

### Mean High Tide Line

■ A good deal is urged about Mean High Tide Line (MHTL). Just what bearing it has at this, not the enforcement, stage is not easy to say. Everyone apparently concedes that the mean high tide line is not a precise measurement. And all concede for this case that relief sought depends on the government proving that Moretti dredged or filled bayward of MHTL. For the Corps has no power landward of it to regulate his conduct or force reconstruction of the topography[40] as it existed before he began work. The District Court agreed that that which was landward of MHTL would not, could not, and should not be affected by mandatory injunction.[41]

The record proof on location of MHTL took two forms. The first was on the trial. The second, as a part of the plan to be filed by Moretti outlining the method to be followed in restoring the prior condition. On the trial, the government called a civil engineer, Mr. James Glass, employed by Moretti in designing the Hammer Point project and in soliciting the after-the-fact permit from the Corps of Engineers. The MHTL was indicated on the sketch which accompanied the application for the after-the-fact permit. Engineer Glass testified that he placed the MHTL from aerial photographs[42] taken before the project got underway. The District Court accepted this determination as correct, but whether the Corps of Engineers ever did is unknown since the permit application aborted. The Resident Engineer also testified as to the location of the MHTL. He stated that normally the MHTL would be located by visual observation, which, however, would be impossible in an after-the-fact situation. The upshot of his testimony was that he

---

37. We hold—disclaiming any novelty for this conclusion—that any filling of navigable waters creates an obstruction to navigation.

38. See note 2, supra.

39. See Note, 24 U.Fla.L.Rev. 795 (1971).

40. Perhaps we should call that which was under water before excavation the "bottomography."

41. The findings of fact and conclusions of law of the District Court appear at 331 F.Supp. 151 (1971).

42. Although referred to in testimony these photographs are not part of the record in this case. They apparently were not admitted as exhibits in the District Court. These photographs were also the basis for the restoration plan map. See note 45, infra. Some other photographs, taken in 1947, which one witness testified represented the shoreline in 1969 as well as 1947 were not made a part of the record on appeal, although they were admitted in the District Court.

had presumed the location of the MHTL from the permit application supplied by Moretti.

Actually, the Court did not undertake to fix MHTL. His final order in a negative sense prohibited further activity bayward of it.[43] And the hotly contested mandatory injunction [44] simply ordered Moretti (i) to restore the prior conditions bayward of MHTL and (ii) to file a formal plan showing in detail how the work was to be carried out.[45]

As a part of the formal post-decree plan Moretti included a plat prepared by Mr. Post, an engineer associated with the same firm as Mr. Glass, the engineer who drafted the after-the-fact permit application. Engineer Post's plat shows, and Moretti cannot seriously dispute, that substantial areas of excavation and refill were bayward of MHTL. If Moretti challenges that, there is no mark of it in the record. Since there is no indication whether the District Court approved the plan[46] it is unavoidable that the exact line may still be open to some question either in further proceedings

before the Department of the Army, the District Court or both. But no action is yet before us which would call for any modification of MHTL.

### Court's Use Of Negative—Affirmative Injunction

■ Putting to one side the drawing of the exact MHTL we have no doubt that the Judge had the right to reach the conclusions that he did both on jurisdiction and the operational facts. It is equally clear that in the posture of the case as it came to him and as he handled it (see notes 30 and 4, *supra*, the Court had the power to issue appropriate injunctions prohibiting any further work. This authority is drawn not only from the Court's equitable powers in carrying out the obvious policy of the Act but such relief is expressly authorized by § 406, see note 2, *supra*.

■ And for the further guidance of the Court and the parties as this case now takes a new twist we have no doubt that the issuance of a mandatory injunction requiring extensive restoration op-

---

43. The negative feature of the order stated that Moretti and his company "are permanently restrained from further violations of Title 33, United States Code, Section 403 and that they are permanently enjoined from conducting any further excavation and alteration of the condition and capacity of Florida Bay at Hammer Point, Key Largo."

44. Moretti has been "permanently enjoined and directed to remove all fill, sand, rock, gravel, rip-rap, and material of any other description the defendants caused to be placed at their trailer park development property located at Hammer Point, Key Largo, bayward of the mean high water mark that existed prior to the defendants' operations in this area, and to restore the navigable capacity of Florida Bay to its original condition as that bay existed at Hammer Point prior to the defendants' development operations."

45. As the Court pointed out, and the order provided, special care had to be exercised during the restoration work to avoid further ecological damage.
The order commanded:
"And further, the defendants are directed to present to the Court within

twenty (20) days of the issuance of this order, adequate plans for the safe removal of this material so as not to interfere with marine or plant life in Florida Bay by the causing of excessive siltation or turbidity. The defendants are directed to outline in this plan the following:
(a) The equipment to be used in the removal of said material;
(b) The procedures to be taken to safeguard Florida Bay; and
(c) The estimated time requested for compliance with this order.
Upon approval of this plan by the Court, defendants are directed to immediately begin removal of said fill."

46. Moretti filed a plan calling for extensive removal and refilling but then sought supersedeas to the injunction while perfecting his appeal from the outcome below. The Court required supersedeas in the amount of $1,000,000 which Moretti was unable to meet. However, the enforcement of the injunction was stayed by the granting of a temporary emergency stay by this Court, which has remained and is still in effect.

erations at very large expense to the developers is entirely within the Court's power as expressly mandated by the statute. Section 406 just plainly states, "the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist."

█ Thus, the statute itself specifically empowers the Court to do just what has been done. We do not mean to say here that in every case involving a violation of the Rivers and Harbors Act where no permit has been obtained and an order to cease operations has been issued the Court must impose such serious sanctions. But clearly the Court has the power to do it and we perceive nothing in this record which would compel us to say that in the Chancellor's discretion he ought not to have imposed this very substantial burden upon this developer.[47]

But while we find ample jurisdiction, and on the record a set of facts which would otherwise authorize the stringent mandatory injunction of restoration, this part of the Court's order must be vacated to permit the further proceedings on the application for an after-the-fact permit.

### The Scene Shifts Again Back To The Army

█ As we have pointed out in great detail § 403 and § 406 with their complementary regulations are structured on a permit system. The statute itself is not to be read as prohibiting all such obstructions, but only those not authorized in accordance with the regula-

tions. Those regulations prescribe also the right to seek an after-the-fact permit. Moretti has initiated this application. Through no apparent fault of his own and without his ever having withdrawn it the Corps of Engineers has either ignored the application or reached some undisclosed determination that because the United States Attorney has successfully been importuned to enter the case the Corps and the Department of the Army have no further obligation. We have held above and repeat again that this is simply not so.

█ Since the statute and the regulations recognize that the developer has a right to seek—not necessarily obtain —an after-the-fact permit and Moretti has undertaken to do this in a way not challenged for its procedural or substantive sufficiency, a Federal Judge has no power to cut off this statutory scheme and insert his judgment for that of a successive layer of experts in the Corps of Engineers, the Chief of the Engineer's office, the Department of the Army, and now, in collaboration with the other departments or agencies under environmental statutes.

█ Whatever difficulties Moretti may face in trying to persuade those authorities that he should have an after-the-fact permit he is entitled to have that application processed fairly and diligently with an opportunity as permitted under the regulations to present supporting data, facts and argument as to why such relief should be granted. Since the application is either still in the Jacksonville office or perhaps has died there, the Army somehow has to revive it, put it back on the tracks and start the machinery as contemplated by

---

47. Although we think this is a matter for initial determination in the further administrative proceedings which we require, one of the things which Moretti emphasizes that makes the result so harsh is that his is just one of a number of like projects which had therefore been either approved by the Engineers or to which they raised no objection. This throws in a sharp conflict the claim of equal protec-

tion—or perhaps more accurately an equal right to violate the law—a sometime facet of equal protection which is today a very appealing claim, on the one hand, and the incessant demand from environmentalists that what has gone on in the past can no longer be tolerated and the time has come to start cleaning up no matter how much it hurts, on the other. *Cf.*, Zabel v. Tabb, 5 Cir., 1970, 430 F.2d 199, note 5, *supra*.

all of the regulations and the accord between the Secretary of the Army and the Secretary of the Interior and the application of all of the other environmental statutes and regulations. We do not undertake here to outline the scope and detail of those administrative proceedings. They must go on fairly as permitted by the regulations. As we read them, if there is a disposition to grant the after-the-fact permit by the Chief of Engineers and the Secretary of the Army they must then consult all of the other agencies concerned with environmental factors which as specified in pertinent legislation and regulations must be brought into the picture.[48]

■ We do think, however, that as a matter of primary jurisdiction[49] it is in the administrative process that the MHTL must first be determined. For where the boundary of its authority is this elusive line, it should have the first opportunity to determine whether and to what extent the area is or is not within its jurisdiction. Federal Power Commission v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 647, 92 S.Ct. 1827, 1842, 32 L.Ed.2d 369, 389; J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104, and Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84 (sequeled in Mobil Oil Corp. v. FPC, 1972, 149 U.S.App.D.C. 310, 463 F.2d 256, cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676, the D.C. Circuit reversed the FPC).

This line limits the jurisdiction of the Corps of Engineers both negatively and affirmatively, and inescapably they must determine this as a part of the applica-

tion now pending. Whether in the administrative process the agency should rely to a great extent upon the record and findings of the Court below is a matter for initial determination by it.

■ Of course the action or non-action of the Department of the Army is judicially reviewable under the Administrative Procedures Act of 5 U.S.C.A. §§ 702, 704 (Supp. V 1970). This is precisely what occurred in Zabel v. Tabb, *supra*, and Bankers Life and Casualty Company v. Village of North Palm Beach, 5 Cir., 1972, 469 F.2d 994.

### The Scene Shifts Again—Back To The Court Below

The upshot is that we remand the case for the Court to keep it actively on its docket. The prohibitory injunctions are to remain in full force pending final determination in the administrative proceedings and any appeals, administrative or judicial, therefrom. The mandatory injunction is vacated, subject to being reinstated on a proper showing after completion of the administrative proceedings and any appeal therefrom to the extent that the after-the-fact permit application does not authorize any or all of the work bayward of MHTL. Of course the Court is authorized to grant such interim relief as might be necessary on a proper showing to prevent further incursions into nature's domain growing out of inaction either in maintenance or in nonrestoration because of the stay which we have heretofore issued.[50]

■ As a tag end, also for the guidance of the parties and the Court on

---

48. It might be argued that the Army need not consult anyone if after appropriate hearing it decides on its own that no permit should be granted on the theory that there is no "impact" on the environment if it is denied. We have, however, questioned this narrow reading of "impact", although in quite a different context. *See,* Hiram Clarke Civic Club, Inc. v. Lynn, 5 Cir., 1973, 476 F.2d 421; and *cf;* Save Our Ten Acres, et al. v. Kreger, 5 Cir., 1973, 472 F.2d 463.

49. This Circuit has—we think with wisdom —been cautious not to trample the primary jurisdiction of administrative agencies. See A.T.A. of Texas v. King, 5 Cir., 1965, 349 F.2d 873, 883; and International Paper Co. v. FPC, 5 Cir., 1973, 476 F.2d 121 (Brown, Chief Judge, concurring); Bankers Life and Casualty Co., *supra.*

50. Since we vacate the mandatory injunction subject to reinstatement the stay heretofore issued is terminated on the issuance of our mandate.

proceedings on remand and after completion of the administrative process, we reject the contention of Moretti that a District Court, as would an administrative agency, is required to obtain an impact statement and go through the procedures set forth in the intricate structure of environmental statutes and regulations where it is otherwise appropriate for an injunction to be issued on equitable principles or because of statutory standards or policies. The Judge should, of course, be conscious of the ecological factors and in many cases it would be appropriate, and in some it might be essential, that he call in the appropriate agencies, state and federal.[51] But the Judge does not have to involve himself in the sometimes impossible task of writing an impact statement that will satisfy all.

Vacated in part and remanded.

---

51. We have done this hundreds of times in school integration cases.