## KENNEDY v. INDIANAPOLIS.

1 Sect. 7, art. 1, of the Constitution of Indiana, adopted in 1816, provides "that no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without a just compensation being made therefor." Under an act of the General Assembly, "to provide for a general system of internal improvements," approved Jan. 27, 1836, the board thereby created was authorized to enter upon, take possession of, and use lands. *Held*, that the right to enter and use them was complete as soon as they were actually appropriated under the authority of that act, but that the title to them did not, without the consent of the owner, vest in the State until just compensation was made to him therefor.

2. The decisions of the Supreme Court of Indiana upon the point cited and examined.

3. In this case nothing was paid, it being considered that the benefits resulting from the construction of the contemplated work would furnish the owner just compensation for the land taken. The work was never constructed, and the State sold the property. *Held*, that no title passed to the purchaser.

APPEAL from the Circuit Court of the United States for the District of Indiana.

The facts are stated in the opinion of the court.

The case was argued by *Mr. Benjamin Harrison* for the appellants, and by *Mr. S. Claypool* and *Mr. David Turpie* for the appellees.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit in equity brought by the appellants to quiet title to certain lands in the city of Indianapolis. The facts are as follows: By an act of the General Assembly of Indiana "to provide for a general system of internal improvements," passed Jan. 27, 1836 (Rev. Stat. Ind., 1838, p. 337, sect. 4), the board of internal improvements was authorized and directed to construct, among other public works, the Central Canal, commencing at the most suitable point on the Wabash and Erie Canal between Fort Wayne and Logansport, running thence to Muncietown, thence to Indianapolis, and thence to Evansville on the Ohio River. For this purpose the board was authorized to enter upon, take possession of, and use any lands necessary for

the prosecution and completion of the work.　Sect. 16.　In all cases where persons felt aggrieved or injured by what was done, a claim could be made for damages, which were to be appraised in a way specially provided for, but in making the appraisement the benefits resulting to the claimant from the construction of the work were to be taken into consideration.　Any sum of money thus found to be due was to be paid by the board, but no claim could be recovered or paid unless made within two years after the property was taken possession of. Sect. 17.　The board was also authorized to acquire, by donation or purchase, for the State, the necessary ground for the profitable use of any water-power that might be created by the construction of the canal, and to lease, for hydraulic purposes, any surplus of water there might be over and above what was required for navigation.　Sects. 22, 23.

The Constitution of the State, adopted in 1816, which was in force when this act was passed, and until all the rights of the State under it had been acquired, contains the following as art. 1, sect. 7: "That no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without a just compensation being made therefor."

The town plat of Indianapolis was laid out on lands granted by Congress to Indiana for a seat of government.　On this plat, as originally made, Missouri Street extended across the town from north to south, a distance of one mile.　The board of internal improvements located the Central Canal in this street throughout its entire length.　From the southerly end of the street the location extended in that direction across what was then known as outlots 121, 125, and 126.　These lots were owned, 126 by one Coe, and the other two by Van Blaricum. During the year 1840 or before, the canal was actually built, filled with water, and to some extent navigated from Broad Ripple, a point on the west fork of the White River, about nine miles north of Indianapolis, to a lock in Missouri Street, at Market Street.　From Market Street the canal was actually dug, and its banks built to another lock, a distance of a mile or more below; but it was never filled with water for the purposes of navigation, or, in fact, opened for navigation.　The lower

lock would perhaps hold the water in the level above, but would not pass a boat below.

About the time this part of the work was finished, the whole project of completing the canal was abandoned, and has never since been resumed. Considerable work had been done on the line as a whole before the abandonment, but the only part ever opened for navigation to any extent whatever was that between Broad Ripple and the Market Street lock. The premises in controversy are between Market Street and the next lock below.

The State made a lease of water-power to be used at this lower lock, and for many years conducted the water to supply that lease through the canal as constructed below Market Street. No other use of the canal was ever made by the State for any purpose, and both the city and the owners of the several outlots have at all times been permitted to fence, bridge, and occupy the property as they pleased, provided they did not interrupt the flow of water to supply the power to a mill that had been built below.

Neither the town of Indianapolis nor Coe ever made any claim on the State for compensation on account of the appropriation of their property. Van Blaricum did, however, do so, and he prosecuted his claim until 1848, when it was finally decided against him. It is conceded that no damages were ever awarded him. The defendants, other than the city of Indianapolis and the railroad company, are the owners of all the title to the outlots occupied by the canal which did not pass to the State under the appropriation that was made.

In 1850, the General Assembly of Indiana passed an act to sell the canal, and under the authority of that act all the part of the canal north of Morgan County, including the premises in controversy, was conveyed to one Francis N. Conwell for the sum of $2,425. From Conwell the title, such as he got, passed by sundry conveyances to the Water-works Company of Indianapolis. Afterwards that part of the premises south of Market Street, not being essential to the business of the Water-works Company, was sold to the Indianapolis, Cincinnati, and Lafayette Railroad Company.

Between 1872 and 1874, the city of Indianapolis, the legal

successor of the town, took actual possession of Missouri Street below the Market Street lock, and used it for sewerage purposes, building a sewer therein and filling up the canal. About the same time McKernan, the ancestor of the present appellees of that name, filled up the canal on the outlots in question, and erected one or more houses thereon. This bill was filed by the mortgagees of the railroad company to quiet the title of the company to this property and protect their security. On the hearing the Circuit Court dismissed the bill for the reason that the appropriation by the State was not sufficient to divest the owners of their title, and consequently the railroad company took nothing by the conveyances under which it claims.

According to the later decisions of the Supreme Court of Indiana, when lands were taken by the State under the internal improvement laws, and just compensation made to the owners, the title in fee was transferred from the owner to the State. *Water-works Company of Indianapolis* v. *Burkhart*, 41 Ind. 364; *Nelson* v. *Fleming*, 56 id. 310. The earlier decisions were the other way. *Edgerton and Others* v. *Huff*, 26 id. 35. But, so far as we have been able to discover, it has never yet been held that the *title* passed out of the owner until "just compensation" had actually been made. In fact, the decisions appear to have been uniformly to the effect that it did not. Thus, as early as 1838, in *Rubottom* v. *McClure* (4 Blackf. 505), it was said in reference to a statute, of which the one now under consideration is almost a literal copy, that it insured "to any individual whose interest may have been made to yield to the public good, remuneration for his loss. Actual payment to him is a condition precedent to the investment of the title to the property in the State, but not to the appropriation of it to public use." This was followed in 1846 by *Hankins* v. *Lawrence*, 8 id. 266. That was a case in which the White Water Valley Canal Company had acquired the title of the State to the White Water Canal, one of the works the board of internal improvements was authorized to construct under the act of 1836, and the question was whether it could, under its charter, enter upon lands to complete that canal, for the purposes of its incorporation, without first having made just compensation to the owner. Upon this the court said: "The

question whether payment must be made before the land is taken and used . . . has been already decided by this court. . . . The possession and use of the land in question by the White Water Valley Canal Company are upon the condition subsequent, that they will not be in default with respect to the payment for the same as prescribed by the charter, nor with respect to the erecting of the works for which the land is taken. It may be that, should any person claiming under the company remain in possession of the land after a default in such payment, or in erecting the works, he would be considered as a trespasser *ab initio*." So far as we have been advised, these cases are still the law of Indiana, and they are certainly supported by high authority. Thus, in *Rexford* v. *Knight* (11 N. Y. 308), the Court of Appeals of New York, speaking of statutes similar to that of Indiana, says: " The construction upon those acts has been that the fee did not vest in the State until the payment of the compensation, although the authority to enter upon and appropriate the land was complete prior to the payment." And so, in *Nichols* v. *Som. & Ken. Railroad Co.* (43 Me. 359), the Supreme Court of Maine, in speaking of an article of the Constitution of that State which declared that private property should not be taken for public uses without just compensation, uses this language: " While it prevents the acquisition of any title to land or to an easement in it, and does not permit a permanent appropriation of it, as against the owner, without the actual payment or tender of a just compensation, it does not operate to prohibit the legislature from authorizing a temporary exclusive occupation of the land of an individual as an incipient proceeding to the acquisition of title to it, or to an easement in it for a public use, although such occupation may be more or less injurious to the owner. Such temporary occupation, however, will become unlawful, unless the party authorized to make it acquire, within a reasonable time from its commencement, a title to the land, or at least an easement in it." And again, in *Cushman* v. *Smith* (34 id. 247): " The design seems to have been simply to declare that private property shall not be changed to public property, or transferred from the owner to others for public use, without compensation." Not to multiply cases further, it seems to us that both

on principle and authority the rule is, under such a constitution as that of Indiana, that the right to enter on and use the property is complete as soon as the property is actually appropriated under the authority of law for a public use, but that the title does not pass from the owner without his consent until just compensation has been made to him.

We proceed now to apply this rule to the facts. It is not contended that compensation in money was made for any of the land in dispute. Van Blaricum claimed money, but the tribunal to which, under the statute, his application was referred decided against him. In effect he was told, in answer to his application, that the benefits he would receive from the construction of the canal would be "just compensation" to him for his property taken. The town and the lot-owners adjoining Missouri Street made no claim for compensation. Neither did Coe, the owner of lot 126. In this way these parties signified under the law their willingness to take as their compensation the benefits which would result to them respectively from the construction of the canal. The appropriation was for public use by means of a canal, and the owners were to be paid their compensation for the land taken by the construction of a canal thereon. It would seem to follow that if the canal was constructed the compensation which the Constitution guaranteed the owner would be made; otherwise not. If the canal was in law built, therefore, the title passed to the State; if not, it remained in the owner. The failure to claim damages within the two years was no more than a waiver of all compensation except such as grew out of the benefits resulting from the construction of the work for which the appropriation was made. To hold that the title passed by mere appropriation, if no claim for damages was made within the two years, would be in effect to decide that if the State entered on land for a particular use and kept possession as against the owner for two years, it got a title in fee whether the property was actually put to the use or not. Such we cannot believe to be the law.

Was there, then, such a canal constructed over and upon the lands in question as the internal improvement act, under which the appropriation was made, contemplated? A canal in the sense which that term implies in this connection means a navigable

public highway for the transportation of persons and property. It must not only be in a condition to hold water that can be used for navigation, but it must have in it, as part of the structure itself, the water to be navigated ready for use. Such an instrumentality for "the advancement of the wealth, prosperity, and character of the State" (*Rubottom* v. *McClure, supra*) might confer benefits that would be a just compensation for the private property taken for its use; but until such a structure is actually furnished complete, it can in no proper sense be said that the works have been constructed from which the benefits that are to make the compensation can proceed. A mill-race carrying water for hydraulic purposes is not enough. There must be a canal fitted in all respects for navigation and open to public use, before the benefits can accrue to the owner which are under the law to overcome his claim for damages. No authority was given the board of improvements to appropriate lands for the use of the water-power created by the canal. That could only be acquired by donation or purchase (sect. 16), and no power could be leased until there was a surplus of water. The canal was to be built for navigation. If when built there was found to be more water than was wanted as a means of transportation, it might be leased, but until there was a canal for navigation there was in law none for power. The use of the water for hydraulic purposes was but an incident to the principal object of the work to be done.

There can be no pretence that this canal was ever navigated below Market Street, or put in a condition for navigation. It was accepted from the contractor, and may have had all its banks and its bed complete; but it is evident from the testimony that it was never finished so that it could be actually used as a navigable canal, and it certainly was never opened by the State to public use in that way. More work had been done on it than on some other parts of the line, but still it was unfinished when the abandonment of the enterprise took place.

We are aware that in the case of the *Water-works Company* v. *Burkhart, supra*, the Supreme Court of Indiana decided that the title to the land then in dispute had passed from the owner to the State, but that was on the level above Market Street, which had been not only made navigable but had actually been

co some extent navigated. The owner, too, had been awarded and paid damages in money. So in *Nelson* v. *Fleming, supra,* the canal was completed and had been in actual use by the public as such for a period of between thirty and forty years before the abandonment occurred. In both these cases, accord ing to the rule that has been stated, the compensation was actually made and the title passed. There the question was one of reversion after title once acquired. Here, as we think, the State never got title, since the requisite compensation was never made. Consequently, the State had no title to this property to convey, and the railroad company took nothing by its purchase. It follows that the decree below was right, and it is consequently.

*Affirmed.*