UNITED STATES of America,
Plaintiff,

v.

SEXTON COVE ESTATES, INC., Key
Largo, Monroe County, Florida, and
Ralph E. Oesterle, Defendants.

No. 74-1067-Civ-WM.

United States District Court,
S. D. Florida.

Feb. 6, 1975.

Robert W. Rust, U. S. Atty., by Lawrance Belknap Craig, III, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Corlett, Merritt, Killiam & Mascaro by Michael D. Sikes, Miami, Fla., and David Paul Horan, Key West, Fla., for defendants.

## FINAL JUDGMENT WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEHRTENS, District Judge.

THIS CAUSE having come before the Honorable Court upon a complaint for injunctive relief by the United States of America, and after consideration of pleadings in this matter, the pre-trial stipulation filed by the parties at the pre-trial conference, December 31, 1974, the trial January 27, 1975, and the Court being otherwise fully advised in the premises, the Court enters the following Final Judgment with Findings of Fact and Conclusions of Law.

### I.

### FINDINGS OF FACT

This action was brought pursuant to the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 403 and 406) by the plaintiff, United States of America, for injunctive relief (1) restraining the defendants, Sexton Cove Estates, Inc. ("Sexton Cove Estates") and Ralph Oesterle, from conducting further filling or excavation or in any manner altering the course, condition or capacity of Blackwater Sound at Sexton Cove Estates, Key Largo, Monroe County, Florida; (2) requiring the defendants to restore those pre-existing canals to their depth and width prior to the widening and deepening

activities of the defendants; (3) requiring the defendants to plug and fill in those canals totally constructed by the defendants; and (4) for such further relief as the Court might deem appropriate.

At the trial held January 27, 1975, testimony was taken from the following witnesses:

Mr. Charles M. Allen, Chief of the Inspection Branch, Army Corps of Engineers;

Alonzo Cothron, President of Alonzo Cothron, Inc.;

Richard Chesher, Ph.D., marine biologist;

Jeffrey Gautier, representative of Sexton Cove Estates, Inc.;

William J. Roberts, Esquire; and

Mr. James T. Glass, professional engineer.

Also, four aerial photographs, an overlay photograph, several additional photographs, soundings charts, plat maps and numerous documents were introduced into evidence.

The defendant, Ralph E. Oesterle, was the President and resident agent of Sexton Cove Estates during the dates pertinent to the complaint. The defendant, Sexton Cove Estates, a corporation organized and doing business within the Sourthern District of Florida, owned a tract of land located on Upper Key Largo, Florida, which it had developed into a trailer park. The development included three pre-existing canals which the defendants stipulated they had first caused to be plugged, widened, deepened and then reconnected these tidal canals to Blackwater Sound. The defendants further admitted by stipulation that they had caused the excavating, widening, deepening and connecting of one other canal to Blackwater Sound; that they had caused another canal to be constructed and connected to Blackwater Sound. Finally, the defendants admitted by stipulation that they had caused the excavation of five additional canals on Sexton Cove Estates which have not

yet been connected to Blackwater Sound. It should be noted that the parties to the action agree that Blackwater Sound was a navigable water of the United States; that Blackwater Sound was tidal; and that those canals connected to Blackwater Sound were subject to tidal fluctuations.

In 1969, the defendants employed an engineering firm, Bailey, Glass and Post, represented by Mr. James Glass, which initiated preliminary studies and made an engineering proposal to representatives of Sexton Cove Estates. In approximately December of 1969, a plat was filed in Monroe County, Florida, indicating the intended construction of some ten canals which would be connected to Blackwater Sound (Sexton Cove). Mr. Glass and Mr. William Roberts both advised Mr. Jeffrey Gautier that in their past experience a United States Army Corps of Engineers ("Corps of Engineers") permit need not be applied for in this particular instance since the dredging and filling activities would presumably be shoreward of the mangrove fringe rather than bayward of this line. Neither Mr. Glass, Mr. Roberts nor Mr. Gautier ever sought the opinion of any Corps of Engineers representatives concerning the proposed dredging and filling activities to take place on Sexton Cove Estates. Roberts (who was simply offering free advice at this point as he was not employed by Sexton Cove Estates until sometime in mid-1971) and Glass based their advice on various cases they had handled in the past involving the Corps of Engineers permit requirements. Mr. Roberts, during this period of time, was aware of the changing attitudes of the Government toward dredge and fill activities, but did not attempt to contact the Corps of Engineers to learn whether a permit would be required for the dredging and filling activities on Sexton Cove Estates itself.

On May 20, 1970, a contract was signed by Jeffrey Gautier, Ralph Oesterle and Alonzo Cothron which established Mr. Cothron as the supervisor of the dredging and filling activities on Sexton Cove Estates. Mr. Cothron began work on the southernmost canal during June of 1970 and finished the three southernmost canals, unplugging these three in December of 1970.

In February of 1971, Charles M. Allen of the Corps of Engineers' Inspection Branch visited Sexton Cove Estates' project and observed the three opened canals; returned to his office in Miami; searched the files for permits or applications and, learning that there was none pending and no permits issued, caused a letter and booklet to be sent Ralph Oesterle, President of Sexton Cove Estates on February 22, 1971, warning of the necessity for a permit for such excavating. On March 22, 1971, a letter was sent by Jeffrey Gautier stating that on advice of counsel no permit was required. Charles Allen returned to the project on May 19, 1971, and discovered that work was underway on two additional canals. These two canals had pre-existed the work of the defendants and had been open to Blackwater Sound prior to their being plugged. While plugged, they were widened and deepened from, as Mr. Cothron stated, approximately six to ten feet to thirty-five to forty feet; they were also extended considerably from their pre-existing length and width.

Mr. Allen returned to his office and a letter dated June 2, 1971, was sent to Mr. Oesterle advising him of the necessity to obtain a Department of the Army permit for the canals. On June 16, 1971, a letter was sent to Mr. Oesterle from the Chief of Operations Division, Jacksonville, Florida, once again stating that Sexton Cove Estates was in error in assuming that no permit was necessary. The defendants chose to ignore the three letters of warning and simply continued their dredging and filling activities.

Approximately December of 1971 the plugs in the canal observed by Mr. Allen were removed, thus connecting them to Blackwater Sound. In May 1971, one of the five canals which remain plugged

was under construction. By February, 1972, these five canals, although plugged, were excavated by the defendants and they exhibited tidal fluctuations. On October 28, 1971, an after-the-fact permit application was submitted by Sexton Cove Estates and on June 12, 1973, the application was denied.

In November, 1974, Mr. Allen once again ventured to Sexton Cove Estates; his mission was to take soundings in the five canals opened by the defendants onto Blackwater Sound. Mr. Allen, during his boat trip, did not observe any "no trespassing" signs on or near the canals. He completed the soundings in each canal without incident.

The result of the development in this area was the complete removal and destruction of all living mangrove plants and the widelife that existed therein. Further, the plugging and later unplugging of what had been the three pre-existing canals (which were navigable and upon whose banks lay the mean high tide line prior to the defendants' excavating) affected the waters of Blackwater Sound. The connecting of the other two canals by pulling their plugs at the completion of the excavation also affected this navigable water of the United States. The waters of Blackwater Sound are now diverted into the canal system with the tidal fluctuations; and waters from the canals return to Blackwater Sound thus altering the course, location, condition and capacity of Blackwater Sound. The mean high tide line is now situated on the banks of each of the canals. Finally, in all regards, the Corps of Engineers acted reasonably in respect to the operations on Sexton Cove Estates. The defendants, on the other hand, conducted these operations for their personal gain, failing to obey the law applicable and ignoring the warnings sent out by the Corps of Engineers.

## II.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction over the subject matter and the parties to this action.

■ B. The activities of the defendants described in the above Findings of Fact constitute violations of the Rivers and Harbors Act of 1899 ("the Act"), 33 United States Code, Section 403 by: (1) creating an obstruction, (2) building a structure, and (3) excavating or filling—all within the navigable waters of the United States and without proper federal authorization.

As stated in Zabel v. Tabb, 430 F.2d 199, 207 (5th Cir. 1970), cert. denied 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971):

> . . . The Act covers both building of structures and the excavating and filling in navigable waters. It is structured as a flat prohibition *unless* —the unless being the issuance of approval by the Secretary after recommendation of the Chief of Engineers. The Act itself does not put any restrictions on denial of a permit or the reasons why the Secretary may refuse to grant a permit to one seeking to build structures on or dredge and fill his own property.

*Zabel*, at 214 and 215, then held that a permit could be denied under the Act on environmental as well as navigational grounds, and that such denial was not a taking of private property. Accord, United States v. Joseph G. Moretti, Inc., 478 F.2d 418, 423 (5th Cir. 1973).

■ The Corps of Engineers need not show how serious the effect of connecting, widening, deepening, or extending a connected canal will be in order to have jurisdiction under 33 U.S.C. Section 403, at least not in the Fifth Circuit. The developers must apply for a permit for any canal. The leading Fifth Circuit case on this point is Tatum v. Blackstock:

> It is clear that it is necessary to obtain a permit from the Corps of Engineers under existing law and regulations before submerged land may lawfully be filled, *excavated, channelled* and other similar activities performed thereon such as contemplated here, if the area is navigable, *or if the proposed work would affect nearby navi-*

*gable waters.* Tatum v. Blackstock, 319 F.2d 397, 399 (5th Cir. 1963). (Emphasis added.)

In the case at bar, the defendants' canals denoted as numbers one (1) through five (5) are tidal and are connected to Blackwater Sound, a navigable water of the United States. The five unopened canals also have tidal fluctuations. Thus, these canals affect the nearby navigable waters; i. e. waters of Blackwater Sound are diverted into the canal systems with the tidal fluctuations and (anoxic, polluted) waters from the canal system are returned to Blackwater Sound; any of these alter or modify the course, location, condition or capacity of Blackwater Sound as a matter of law:

> *Any excavation or filling operation must necessarily "alter" or "modify" the body of water which is its subject.* United States v. Benton and Company, Inc., 345 F.Supp. 1101, 1102 (M.D. of Fla.1972). (Emphasis added.)

The Fifth Circuit in Tatum v. Blackstock, *supra,* also holds clearly that man-made channels connecting with tidal waters become navigable waters of the United States notwithstanding that they are on private property. The Court stated:

> . . . At the point where plaintiff's property and other property in the subdivision join this low tidal flat, a *man made channel* has been dug running from the channel of Taylor Bayou on the west in an easterly direction and forming the south and east boundaries of the *tidal* flat, connecting with Taylor Lake. Thus the area is now completely surrounded by navigable water and in effect what was a peninsula is now rendered an island by the cutting of the *man made channel, and the channel is navigable water of the United States.* Tatum v. Blackstock, Id., 319 F.2d at 398. (Emphasis added.)

In the instant case, it is stipulated that the defendants' canals are tidal and, therefore, the widening, deepening, extending and connecting of the canal system was a violation of the Act; i. e. unauthorized excavating in navigable waters of the United States, notwithstanding that the defendants' development was on private property at least part of which was originally uplands.

In the classical sense, the defendants' canal system is itself "navigable waters of the United States" merely by virtue of its being tidal. To quote the Third Circuit, the test of navigability in tidal waters is the ebb and flow of the tide:

> Stoeco would have us read *The Daniel Ball* [The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999] and *The Genesee Chief* [The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058] as both an expansion and a contraction of admiralty jurisdiction; an expansion to non-tidal waters and a contraction, in tidal waters, to areas of actual or reasonably potential navigability. There is no reason to believe that anything other than expansion was intended, however. Subsequent decisions of the Supreme Court do not suggest any contraction. None of those cases, we must concede, deal precisely with the tidal marsh issue. Stoeco urges that Leovy v. United States, 177 U.S. 621 [20 S.Ct. 797, 44 L.Ed. 914] (1900) is authority for the proposition that *The Genesee Chief* represents a contraction as well as an expansion. That case, involving the erection of a dam at Red Pass, on the Mississippi River, in Louisiana, does stand for the proposition that a showing of actual capacity for navigation must be made before the 1899 Act applies. But it deals, so far as the opinion discloses, with a dam at a non-tidal location. *In non-tidal waters the test is actual or reasonably potential navigability. In tidal waters the test, in our view, remains what it was before 1851, the ebb and flow of the tide.* And since it is clear that the 1899 Act and its 1890 predecessor were intended to adopt a definition of navigable waters at least as wide as the admiralty jurisdiction

(though Congress could under the Commerce Clause have gone further) we hold that a Section 10 applies to tidal marshes. United States v. Stoeco Homes, Inc., 498 F.2d 597, 610 (3rd Cir. 1974). (Emphasis added.)

■ Furthermore, in United States v. Joseph G. Moretti, Inc., 478 F.2d 418, 428–429 (5th Cir. 1973), emphasis was placed upon the establishment of the mean high tide line in defining navigable waters. In the case at bar, canals denoted as three (3), four (4) and five (5) were existing prior to the excavating (admittedly, widened and deepened) and therefore the mean high tide line existed on the banks of these pre-existing canals. As to canals one (1) and two (2), the defendants have admitted that they constructed or caused to be constructed these canals, and caused them to be connected to Blackwater Sound. The defendants have agreed that Blackwater Sound is a navigable water of the United States. Once a developer connects illegal canals with navigable waters of the United States, these canals themselves become navigable waters of the United States. In the case at bar, the mean high tide line is now located on each bank of the defendants' canal system. In both United States v. Mitchell, No. 73–1125 (D. of S.C. June 4, 1974) and United States v. Joseph G. Moretti, Inc., 387 F.Supp. 1404 (S.D. of Fla., 1974), the court's injunctions provided for restoration of the defendants' canals above and below the pre-existing mean high tide line; the injunction did not stop at the pre-existing mean high tide line but recognized the newly created line within the canals.

Even using the (incorrect) test of navigability applicable for non-tidal rivers, i. e. actual or reasonably potential navigation, discussed in United States v. Stoeco Homes, supra, 498 F.2d at 610; and discussed in United States v. Joseph G. Moretti, Inc., supra, 478 F.2d at 428, the defendants' opened canal system has been navigated by Mr. Allen during his November, 1974 soundings expedition and Mr. Cothron stated that the pre-ex-

isting canals could be navigated, although "lack of commercial traffic is no bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation", United States v. Lewis, 355 F. Supp. 1132, 1136 (S.D. of Ga., 1973). As the Fifth Circuit stated in *Moretti*:

. . . Moretti's development of his property including finger slips and canals . . . would be incomprehensible and obviously wasteful and a deception to purchasers who expected waterborne access to the sea, not the restricted movement in a landlocked pond.

■ It is perfectly obvious in the case at bar that each of the opened canals were excavated by the defendants to provide access to Blackwater Sound and thus are navigable in fact.

■ Artificial canals have never been exempt from federal regulation under the Act. Sanitary District v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L. Ed. 352 (1925); Tatum v. Blackstock, *supra*; United States v. Joseph G. Moretti, Inc., *supra*; United States v. Mitchell, *supra*. Nor have artificial canals been exempt from the federal judicial power:

Admiralty jurisdiction [extends] the judicial power of the United States to all cases of admiralty and maritime jurisdiction. This includes *canals* and other waters even if they be *privately owned*. Ex Parte Boyer, 109 U.S. 629, 3 S.Ct. 434 [27 L.Ed. 1056], Silver Springs Paradise Co. v. Ray, 5 Cir., 50 F.2d 356. McKie v. Diamond Marine, 204 F.2d 132, 134 (5th Cir. 1953). (Emphasis added.)

This Court is not unaware of the holding of the Florida Circuit Court of Monroe County in State of Florida Board of Trustees of the Internal Improvement Trust Fund v. Sea-Air Estates, Inc., et al., No. 7–542–CR–17 (May 28, 1974), wherein that state court found that the defendant's excavations were conducted in artifically created waters and, under

the provisions of Florida Statutes 253.-123(1), there was no need for the defendant to obtain a permit from the Trustees. However, the United States' jurisdiction is a far broader concept than the Florida Trustees' ownership of certain bottom lands; and as one federal court held:

> Navigability for federal regulatory purposes is governed by federal law and state law is not authoritative in such cases. See Wisconsin v. Federal Power Commission, 214 F.2d 334, 336–337 (7th Cir.), cert. denied, 348 U.S. 883, 75 S.Ct. 124, 99 L.Ed. 694; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 87, 43 S.Ct. 60, 67 L.Ed. 140. United States v. Lewis, supra, 355 F.Supp. at 1137.

█ Even if the defendants should now voluntarily plug their canal system, the canal system would remain navigable waters of the United States. "Once found to be navigable, a waterway remains so." United States v. Appalachian Electric Power Co., 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940).

Finally, the pre-existing canals (prior to 1969) numbers three (3), four (4) and five (5) on Sexton Cove Estates were navigable waters of the United States, Tatum v. Blackstock, *supra*, and the mean high tide line existed on their banks prior to the defendants' operations. The filling and excavating of these canals by the defendants took place below the mean high tide line.

The two additional opened canals, numbers one (1) and two (2), which the defendants excavated and opened onto Blackwater Sound, themselves became navigable waters of the United States; the excavating of the plugs in these canals necessarily took place before the mean high tide line.

The excavating of the five (5) unopened canals, which now evidence tidal fluctuations, altered or modified the course, condition, location or capacity of navigable waters of the United States.

█ The Government need not prove irreparable injury or an inadequate remedy at law to obtain injunctive relief under the Rivers and Harbors Act:

> It is not necessary that the government prove that it lacks an adequate remedy at law where injunctive relief is sought in this type of case. In Shafer v. United States, 229 F.2d 124 (5th [sic] Cir. 1956), the Court said: "It is contended that the Government has not shown irreparable injury and that it has an adequate remedy at law . . . The United States, however, is not bound to conform with the requirements of private litigation when it seeks the aid of the courts to give effect to the policy of Congress as manifested in a statute. It is a familiar doctrine that an injunction is an appropriate means for the enforcement of an Act of Congress when it is in the public interest." United States v. Underwood, 344 F.Supp. 486, 494–495 (M.D. of Fla.1972).

The Third Circuit also has held that "No balancing of interest or need to show irreparable injury is required when an injunction is sought under Section 12 (of the Rivers and Harbors Act, 33 U.S.C. § 406) to prevent erection or seek removal of an unlawful structure; . . ." United States v. Stoeco Homes, Inc., *supra*, 498 F.2d at 611.

█ In accordance with Title 33, United States Code Section 406, a canal is constructed and therefore is a "structure."

> Structure . . . 2. Something built or constructed, as a building or dam. Webster, New World Dictionary (2nd College Ed. 1972).

The Supreme Court has defined "canal" as a structure thusly:

> . . . [T]he word "canal" means a navigable, public highway for the transportation of persons and property. It must not only be in a condition to hold that water that can be used for navigation, but it must have in it, *as part of the structure itself*, the water to be navigated ready to use. A mill race carrying water for hydraulic purposes is not enough. Kennedy v.

Indianapolis, 103 U.S. 599, 604, 26 L. Ed. 550. (Emphasis added.)

 The public is entitled to a broad construction of 33 U.S.C. § 406 to effect the expressed intent of Congress and to protect the navigational and environmental public interest:

The relief to which the government is entitled is the "remedy that ensures the full effectiveness of the Act", Wyandotte [Wyandotte, Transportation Co. v. United States], 389 U.S. 191, at p. 204, 88 S.Ct. [379,] at p. 387, [9 L.Ed.2d 407]. . . . In construing Section 406, the Honorable William O. Mehrtens held:

"Although Section 406 authorizes the removal of 'structures' created in violation of Section 403, the language in Section 403 of Title 33, United States Code, specifically the use of the word 'obstruction' is broad enough to justify the removal of any obstruction *or any diminution of the navigable capacity of a waterway.* Consequently, a district court has authority under the Rivers and Harbors Act of 1899 to order the navigable capacity of a waterway restored. United States v. Joseph G. Moretti, Inc., supra, [331 F. Supp. 151,] p. 158 (D.C.)."

The power of the district court to grant injunctive relief is far greater in situations where the public interest is involved. Virginian Railway Company v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); United States v. First National Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1964). The public interest in protection of the navigability and the ecological aspects of the waters of the United States is clearly spelled out in the National Environmental Policy Act of 1969, Title 42, United States Code, sec. 4331 et seq. and the Fish and Wildlife Coordination Act of 1958, Title 16, United States Code, sec. 661 et seq. Zabel v. Tabb, supra. United States v. Underwood, 344 F.Supp. 486, 494 (M.D. of Fla.1972)

Therefore, defendants' canal system is also an "obstruction" that diminishes the navigable capacity of a waterway as well as a structure.

The Supreme Court in discussing the inadequacy of the criminal penalties provided by 33 U.S.C. Section 406 had previously incorporated obstructions as structures within Section 406:

. . . We decided that the Government might seek injunctive relief to compel removal of such an obstruction, even though such relief was nowhere specifically authorized in the Act. We concluded that the authorization of injunctive relief in § 12 (33 U.S.C. § 406) which is applicable only to a limited category of § 10 (33 U.S. C. § 403) obstructions (structures), should not be read to exclude injunctions to compel removal of other types of § 10 obstructions. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 202–203, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967).

In view of the foregoing, it is clear that the defendants have violated 33 U.S.C. Section 403 by creating a structure, by excavating, and by creating an obstruction—all in navigable waters without a federal authorization and that injunctive relief under 33 U.S.C. Section 406 is appropriate for each violation absent a valid defense.

 C. Neither equitable estoppel nor laches precludes the Government from enforcing the statute or asserting its rights under the statute in the case at bar.

The regulation in effect at the time of defendants' activity was 33 C.F.R. 209.-120 dated December 18, 1968. "Permits For Work In Navigable Waters." In paragraph (b)(1)(b) the Corps of Engineers regulations state:

(b) Piers, dredging, etc., in waterways. Plans for wharves piers . . . or other structures, and *excavation or fill in navigable waters* must be recommended by the Chief of Engineers and approved by the Secretary of the Army. Section 10 of the

Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403). (Emphasis added.)

Paragraph (3) of 33 C.F.R. 209.130, the regulation concerning application for "Piers, dredging etc. in waterways", states:

> The letter (of application) will give any explanation of the plans necessary to enable the Department of the Army to determine exactly what is proposed and to show that the structure is not likely to fail and become a danger or obstruction to navigation or *injure the navigable capacity of any of the public navigable waters*. (Emphasis added.)

Paragraph (18) of 33 C.F.R. 209.130, under Additional Instructions, the 1968 regulations state:

> Applicants for permits for dredging and filling operations, cooling water outfalls from steam electric plants, and similar work *which may affect the navigable capacity of waterway* or have a pollution impact on a waterway are required to furnish the following additional information . . .. (Emphasis added.)

In light of the above, it is clear that the Corps of Engineers required permits for work in navigable waters and for work which affect the navigable capacity of the waterway.

The instant case is similar to the facts of United States v. Sunset Cove, 5 E.R.C. 1029 (D.Ore.1973), wherein the Court rejected defendants' arguments of estoppel since the defendants had not in the strict sense of the word, relied upon the representations of the Government or its agents:

> It never submitted its plans to the Corps until after the work was done. Rather, it relied on the judgment of its own officers and attorneys that its plans were lawful. It could not have been relying upon the representations by the Corps that its project was lawful because it had commenced its work before the Corps became aware of what the project was.

The defendants could have achieved a much greater degree of security in dealing with the Government by following certain procedures, as the Court noted:

> Had it made an application in advance to the Corps for a permit, or at least if it had made an inquiry and provided the Corps with complete plans of its intentions, its position would be less vulnerable. By failing to take advantage of the opportunity which it had, not only did it forfeit a claim to a right of estoppel, but it also deprived the Corps of a means whereby its attention could have been formally directed to the issue. United States v. Sunset Cove, 5 E.R.C. 1028, 1029 (1973).

Therefore, whatever doubts the defendants may have had concerning the legality or illegality of their project, they could have submitted their plans to the Corps for a determination. The defendants relied instead upon their attorney and engineer.

Further, it should be noted that several courts have dealt with the estoppel issue and are unanimous in rejecting estoppel as a defense in an enforcement action under 33 U.S.C. Section 403. In United States v. Stoeco Homes, Inc., *supra*, the Court held:

> . . . Moreover, even assuming that defendant was somehow misled by the ACOE, the Federal Government cannot be prevented from exercising its authority over the navigable waters of the United States by reason of estoppel, laches or private expenditures founded upon mistaken assumptions. United States v. California, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L.Ed. 1889, Opinion Supplemented, 332 U.S. 804, 68 S.Ct. 20, 92 L.Ed. 382, reh. den., 332 U.S. [787], [68 S.Ct. 37, 92 L.Ed. 370] (1947), pet. den., 334 U.S. 855, 68 S.Ct. 1517, 92 L.Ed. 1776 (1948). (359 F.Supp. 672 at 677–678 (D.N.J.)).

Accord, United States v. Lewis, *supra*, and United States v. Sunset Cove, Inc., *supra*.

It is well-settled that the Government may not be precluded from enforcing a statute or asserting its rights under statute by reason of the doctrine of laches or estoppel. In United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L. Ed. 1889 (1947), where the question was whether the United States or the coastal States had paramount rights in and power over the submerged lands in the three-mile marginal belt in the Pacific Ocean, the conclusion by a former Secretary of the Interior that California had sole jurisdiction to grant oil and gas leases within its coastal shelf was deemed by the Supreme Court not to stop the Government from pursuing its claim. The Court rejected the State's argument that in reliance upon its disclaimer, improvements had been made along and near the shores at great expense to the public and private agencies, and stated (at pages 39–40, 67 S.Ct. at page 1669):

> And even assuming that Government agencies have been negligent in failing to recognize or assert the claims of the Government at an earlier date, the great interests of the Government in this ocean area are not to be forfeited as a result. The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.

In Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L. Ed. 791 (1917), the Supreme Court sustained the right of the United States to enjoin the continued unauthorized occupancy and use of public lands, and to secure compensation for such past occupancy and use in the past. The Power Company argued, *inter alia*, that it had invested several million dollars in facilities on public lands in reliance upon agreements with unspecified federal officials, and that these agreements barred the United States by acquiescence and laches. The Court rejected these arguments in holding (at page 409, 37 S.Ct. at page 391):

> * * * the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit. * * * As a general rule laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest. . . .

> A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it.

More recently, in Atlantic Richfield Company v. Hickel, 432 F.2d 587 (1970), the Tenth Circuit Court of Appeals sustained the power of the Secretary of the Interior to demand 13 years' back royalty work over $5 million based on a corrected method of calculation, regardless of erroneous and misleading advice given by subordinate departmental officials.

The Court wrote (at 591–592):

> . . . the United States may not be estopped from asserting a lawful claim by the erroneous or unauthorized actions or statements of its agents or employees, nor may the rights of the United States be waived by unauthorized agents' acts. As harsh as the tenet is under practical application, an administrative determination running contrary to law will not constitute an estoppel against the federal government.

In view of the foregoing, the defense of estoppel or laches is not available to

the defendants. Nor is the time worn cry of the developer "selective enforcement" of any avail for if such a defense ever existed in this Circuit, it has been recently laid to rest. United States v. Ream, 491 F.2d 1243 (5th Cir. 1974); United States v. Raven, 500 F.2d 728, note 14 (5th Cir. 1974).

## III.

### FINAL JUDGMENT

After due consideration of the aforementioned Findings of Fact and Conclusions of Law, it is hereby

Ordered and adjudged that the defendants, Sexton Cove Estates, Inc. and Ralph E. Oesterle, are directed to fill all pre-existing canals (numbers three (3), four (4) and five (5)) on Sexton Cove Estates, and it is further

Ordered and adjudged that the defendants are directed to fill the two canals excavated and opened onto Blackwater Sound (numbers one (1) and two (2)) to a depth of six (6) feet at the mouth, sloping upwards to five (5) feet at the upland ends; and it is further

Ordered and adjudged that the defendants are directed to fill completely those five tidal canals left unopened to Blackwater Sound with material of the same permeability as that removed; and it is further

Ordered and adjudged that the defendants are directed to re-plant the red mangrove fringe along the banks of the restored canals; and it is further

Ordered and adjudged that the defendants shall, within thirty (30) days of the issuance of this Order, present to this Court the United States Corps of Engineers, the United States Fish and Wildlife Service, adequate plans and a timetable for accomplishing the foregoing system with the minimum adverse effect on the environment; and it is further

Ordered and adjudged that upon approval of this plan by the Court the defendants will immediately begin and be completed within 180 days; and it is

Further ordered and adjudged that the defendants are permanently enjoined from selling, conveying, or disposing of any real property at the development without the prior approval of the Court until the aforesaid restoration has been accomplished.